On Direct Appeal
Justice Himonas,
opinion of the Court:
INTRODUCTION
¶1 This is an appeal from a parental-rights termination order entered in the district court. On November 24, 2014, the district court terminated L.E.S.’s parental rights with respect to K.A.S., making K.A.S. legally available for adoption by her stepfather, C.D.M. L.E.S. appealed the termination order to the Utah Court of Appeals, which subsequently certified the case for transfer to the Utah Supreme Court. The issues presented on appeal are a claim of ineffective assistance of counsel and claims to the right to counsel under the Equal Protection Clause of the Fourteenth Amendment, under the Due Process Clause of the Fourteenth Amendment, and under the due process clause of the Utah Constitution. For reasons explained below, we hold that the denial of counsel violated L.E.S.’s federal due process rights and reverse and remand for further proceedings in accordance with this opinion.
BACKGROUND
¶2 On or about September 23, 2013, C.D.M. and M.K.M. filed a petition for adoption in Uintah County, Utah. C.D.M. sought to adopt his stepdaughter, K.AS, who was bom in 2008. L;E.S., K.AS.’s biological father, was served with a Notice of Adoption Proceedings on September 23, 2013, requiring him to respond within thirty days if he intended to intervene in or contest the adoption. On or about October 2, 2013, L.E.S., acting pro se, gave notice that he contested the adoption. C.D.M. and M.K.M. then moved to terminate L.E.S.’s parental rights.
¶3 The case was set for trial for termination of parental rights on December 10, 2013. M.K.M. was present with counsel. L.E.S. was present in custody, pro se, having been transported from the Uintah County Jail, where he was incarcerated at the time. Upon questioning L.E.S. about his income and assets, the district court found that he “would qualify for court appointed counsel if this were in the Juvenile Court but questioned] whether [that statutory right to court-appointed counsel] applies to [the] District Court.”[1] The district court discussed L.E.S.’s right to counsel with Deputy County Attorney Michael Drechsel, who “agreed that Uintah County would be obligated to pay for an attorney to represent the indigent father.” Based on Mr. Dreehsel’s input, the district court appointed counsel for L.E.S.
¶4 On January 24, 2014, Mr. Drechsel filed a motion to intervene on behalf of Uintah County, asserting that his representations “were made in error and contrary to law” and that there was no right to court-appoint: ed counsel for an indigent party in district court proceedings involving the termination of parental rights. In that motion, he requested that the .district court reverse its decision to appoint counsel and that it then dismiss Uintah County from the action. No opposing memoranda were filed by any party. L.E.S.’s court-appointed counsel did not respond or request a hearing on the issue, and L.E.S., because he was represented at the time, did not have an opportunity to oppose the motion pro se. See infra ¶ 20. On February 19, 2014, the district court granted the motion to intervene, reversing the appointment of counsel.
*282 ¶5 The district court held a number of court conferences over the next few months, during which time L.E.S. unsuccessfully attempted to retain counsel. On April 10, 2014, a status conference was held, and the district court set a telephonic scheduling conference with L.E.S., who was then incarcerated at the Utah State Prison, for April 22, 2014. L.E.S. was also informed that he should retain counsel if he so desired.
¶6 At the April 22, 2014 scheduling conference, L.E.S., participating by telephone, requested additional time to retain counsel.
¶7 An attorney review hearing was held on June 3, 2014, which L.E.S. also attended telephonieally. At this hearing, L.E.S. indicated that he “believe[d] his family [was] taking care of his counsel for him but [that he had] not been able to speak with them.” The district court set a status conference for June 9, 2014, in order to allow L.E.S. more time to speak with his family.
¶8 At that status conference, where L.E.S. was present from prison, the district court noted that L.E.S. “had difficulty contacting family or counsel due to the prison telephone policies to make arrangements] to retain counsel.” The district court asked an attorney who was serving as counsel for L.E.S. in a juvenile court case to contact L.E.S.’s family in order to “understand where they stand with making counsel arrangements for [L.E.S.] and report back to the [c]ourt.” The district court also “ask[ed] the prison to allow [L.E.S.] telephone privileges so he can talk with lawyers and/or family members so this [c]ourt can move this matter along.”
¶9 On June 17, 2014, L.E.S.’s juvenile court counsel reported to the district court that L.E.S.’s family was working on obtaining counsel and that they requested additional time. L.E.S.’s sisters were present and requested “notification of all hearings to try and help the[ir] brother due to communication issues with [L.E.S.] in prison.”
1110 Another status conference was held on June 30, 2014. L.E.S. was supposed to attend telephonieally but “was not available by telephone due to changes in probation officers at the prison.” L.E.S.’s sisters were present and reported that they had talked with a lawyer, Ms. Bradley, who needed to speak with L.E.S. The district court noted that L.E.S. was “to sign a waiver to allow his sisters to have access to court records to help with his defense.” The district court scheduled a bench trial for the termination proceeding for September 26, 2014.
¶11 On July 22, 2014, yet another status conference was held “to check the status of counsel for [L.E.S.].” Ms. Bradley had talked with L.E.S. on the telephone right before the hearing and requested additional time to review the information from that telephone meeting.
¶12 The next status conference was held on July 29, 2014. L.E.S. attended telephoni-cally and sought to present a verbal motion for continuance, which the district court asked him to file in writing instead.
¶13 L.E.S. filed his written motion for continuance with the district court on August 4, 2014, requesting to have the matter continued until at least April 29, 2016, when he expected to be released. In his motion, L.E.S. indicated, among other things, that the prison would “not allow [him] phone access for any legal reason based on a conflict they have,” that he could “not obtain adequate employment and [did] not have any other means available to [him] ... at the prison that would allow [him] the money to pay for counsel,” and that he was “at this time financially incapable of hiring counsel.” He represented that he had “one opportunity” to talk with a lawyer but that Ms. Bradley “said she was reluctant to take on the case in fear that because of the [above-mentioned] prison policy she would not be able to provide adequate counsel.” C.D.M. and M.K.M. opposed the motion for continuance.
¶14 No oral argument was requested on the matter of the motion for continuance, and on September 2, 2014, C.D.M. and M.K.M. requested that the briefs be submitted for a ruling. On September 6, 2014, the district court issued a ruling and order denying the motion for continuance. The district court based its decision on the following reasons: the matter had “been pending since September 23, 2013”; “[mjultiple status hearings ha[d] been held in an effort to provide [L.E.S.] the opportunity to find counsel”; *283 L.E.S. had “had ample time to prepare for the trial, or to obtain counsel to represent him at trial”; and a “permanent living environment and a resolution to these proceedings are in the best interest of the minor child.”
¶15 On September 8, 2014, the district court held another status conference. L.E.S. was not present. The district court denied the motion to continue and indicated its intent to “[o]rder the state of Utah to transport [L.E.S.] ... for a termination of parental rights hearing on September 26, 2014.”
¶16 The termination of parental rights hearing was held on September 26, 2014, and the district court made findings against L.E.S. and found that it was in the best interest of the child for K.A.S. to be adopted by C.D.M. L.E.S. filed a notice of appeal on October 22, 2014. The district court issued its “findings of fact[,] conclusions of law and order” on November 24, 2014, terminating L.E.S.’s parental rights in and to K.A.S.
¶17 L.E.S. appealed the district court’s termination order to the Utah Court of Appeals, which certified the case for transfer to the Utah Supreme Court on July 7, 2016. We heard oral arguments in the matter on September 2, 2015. On September 21, 2015, we asked for supplemental briefing from the parties and the Attorney General’s Office on the constitutional question raised by L.E.S.’s argument that Utah Code section 78A-6-llll(l)(a) (2012) and section 78A-6-llll(l)(a)-(c) (2014) (two versions of the right-to-counsel provision of the Juvenile Court Act) violate equal protection under the Fourteenth Amendment and due process. Following supplemental briefing, oral arguments were again heard on March 2, 2016.
¶18 L.E.S. raises four issues on appeal: a claim of ineffective assistance of counsel and claims to the right to counsel under the Equal Protection Clause of the Fourteenth Amendment, under the Due Process Clause of the Fourteenth Amendment, and under the due process clause of the Utah Constitution. We hold that, even though not preserved, the constitutional issues may be reached in this case under the exceptional circumstances exception. For reasons explained below, we hold that the denial of counsel violated L.E.S.’s federal due process rights. We reverse and remand for further proceedings in accordance with this opinion.
PRESERVATION
¶19 We first address the issue of preservation and hold that the constitutional arguments for the right to counsel may be reached in this case under the exceptional circumstances exception. When an issue is not properly preserved, we will address the issue for the first time on appeal “only if (1) the appellant establishes that the district court committed ‘plain error,’ (2) ‘exceptional circumstances’ exist, or (3) in some situations, if the appellant raises a claim of ineffective assistance of counsel in failing to preserve the issue.” State v. Low, 2008 UT 58, ¶ 19, 192 P.3d 867 (citation omitted); see also State v. Munguia, 2011 UT 5, ¶¶ 10-13, 253 P.3d 1082; H.U.F. v. W.P.W., 2009 UT 10, ¶ 25 n.12, 203 P.3d 943; State v. Lee, 2006 UT 5, ¶ 24, 128 P.3d 1179. Exceptional circumstances is a doctrine that “applies to rare procedural anomalies.” Jacob v. Bezzant, 2009 UT 37, ¶ 34, 212 P.3d 535. We apply this “exception sparingly, reserving it for the most unusual circumstances where our failure to Consider an issue that was not properly preserved for appeal would have resulted in manifest injustice.” Id. (internal quotation marks omitted).
¶20 Exceptional circumstances is a narrow exception but one that is met by the unusual procedural circumstances in this ease. The district court initially granted L.E.S. “appointed counsel in a parental-rights termination proceeding initiated by a private party in district court.” The deputy county attorney, on whose advice the court had relied in appointing counsel, later filed a motion to intervene, arguing that the statute did not provide a right to counsel for termination proceedings in district court. L.E.S.’s court-appointed counsel failed to respond to the motion. Additionally, since L.E.S. was represented by counsel, L.E.S. had no right to oppose the motion himself. See State v. Navarro, 2010 UT App 302, ¶ 3, 243 P.3d 519 (per curiam) (“[T]he [criminal] defendant may not benefit from the assistance of eoun- *284 sel while simultaneously filing pro se motions.”); State v. Wareham, 2006 UT App 327, ¶ 33, 143 P.3d 302 (“The [criminal] defendant may choose self-representation or the assistance of counsel, but is not entitled to a ‘hybrid representation’ where he could both enjoy the assistance of counsel and file pro se motions. The only exception to this rale is that a defendant may file a pro se motion to disqualify his appointed counsel.” (citation omitted)). The court granted the unopposed motion, denying L.E.S. court-appointed counsel. L.E.S. subsequently found himself unrepresented and would have to make a sophisticated constitutional argument for the right to counsel, Most importantly, L.E.S, had no technical vehicle for making such an argument because he had already lost on the issue of the right to counsel, and “[m]otions to reconsider are not recognized by the Utah Rules of Civil Procedure.” Tschaggeny v. Milbank Ins. Co., 2007 UT 37, ¶ 15, 163 P.3d 615.
¶21 We conclude that these circumstances constitute one of those “rare procedural anomalies” that qualify for the exceptional circumstances exception to the preservation rule.[2] When a party is appointed counsel who refuses to make an argument for the right to counsel when that right is challenged, and the party is barred from making that argument, and the party then is denied counsel and subsequently would have to make a sophisticated constitutional argument for the right to counsel with no technical vehicle for making such an argument, exceptional circumstances are met.[3] Thus, under the exceptional circumstances exception, we may reach L.E.S.’s constitutional arguments for the right to counsel in parental-rights termination proceedings, even though they were raised for the first time on appeal.
ANALYSIS
¶22 We apply the test from Lassiter v. Department of Social Services and determine that L.E.S. had a federal due process right to counsel in the district court proceedings and that that right was erroneously denied. 452 U.S. 18, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981).[4] L.E.S. correctly argues that “the tri *285 al court erred by failing to consider the Eldridge factors” as applied by the United States Supreme Court in Lassiter.[5] In Lassi-ter, the Court considered whether indigent parents in parental-rights termination proceedings have a right to counsel. The Court recognized that there is a presumption against the right to counsel unless an indigent litigant’s physical liberty is at stake but held that that presumption may be overcome by the Eldridge factors. It determined that courts “must balance [the Eldridge factors] against each other, and then set their -net weight in the scales against the presumption that there is a right to appointed counsel only where the indigent, if he is unsuccessful, may lose his personal freedom.” Id. at 27, 101 S.Ct. 2153.
¶23 It appears from the record that the district court found that L.E.S. was indigent. Upon making that finding, the district court was required as a matter of law to apply the test set forth in Lassiter in order to determine whether L.E.S. had a right to counsel. Nowhere in the record does it appear that the district court applied the Lassi-ter test. Instead, the district court appears to have based its decision that L.E.S. had no right to counsel on an interpretation of the right-to-eounsel provision in the Juvenile Court Act and the lack of a corresponding provision in the district court context. This was error. And “because child-custody litigation must be concluded as rapidly as is consistent with fairness,” rather than remand for additional findings, “we decide today whether the [district court] judge denied [L.E.S.] due process of law” under the Fourteenth Amendment by reversing its original appointment of counsel for L.E.S. Id. at 32, 101 S.Ct. 2153. (footnote omitted).
¶24 According to Lassiter,
[i]f, in a given case, the parent’s interests -were at their strongest, the State’s interests were at their weakest, and the risks of eri’or were at their peak, it could not be said that the Eldridge factors did-not overcome the presumption against the right to appointed counsel, and that due process did not therefore require the appointment of counsel.
Id. at 31, 101 S.Ct. 2153. To put it more plainly, where the parent’s interests are at their strongest, the State’s interests at their weakest, and the risks of error at their peak,[6] the presumption against the appointment of counsel has been overcome and due process requires the appointment of counsel. We now proceed to analyze the Eldridge factors in the context of the case at hand and determine that they overcome the presumption against the right to counsel. Thus, we conclude that L.E.S. had a federal due process right to counsel in the district court, proceedings. Because that right was denied, we reverse and remand for further proceedings in accordance with this decision.
I. L.E.S.’S INTERESTS
¶25 First, we consider the private interests at stake: L.E.S.’s parental interest in his daughter, K.A.S. A parent’s “right to ‘the companionship, care, custody, and management of his or her children’ is an important'interest that ‘undeniably warrants defer *286 ence and, absent a powerful countervailing interest, protection.’” Lassiter v. Dep’t of Soc. Servs., 452 U.S. 18, 27, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981) (quoting Stanley v. Illinois, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972)). In fact, “[t]he right of a fit, competent parent to raise the parent’s child without undue government interference is a fundamental liberty interest that has long been protected by the laws and Constitution and is a fundamental public policy of this state.” Utah Code § 62A-4a-201(l)(c);[7] see id. § 78A-6-503(l) (“Under both the United States Constitution and the constitution of this state, a parent possesses a fundamental liberty interest in the care, custody, and management of the parent’s child.”); id. § 78A-6-503(4) (“The court should give serious consideration to the fundamental right of a parent to rear the parent’s child, and concomitantly, [to] the right of the child to be reared by the child’s natural parent.”); see also Lassiter, 452 U.S. at 38, 101 S.Ct. 2153 (“[F]ar more precious .., than property rights, ... parental rights have been deemed to be among those essential to the orderly pursuit of happiness by free men.” (first and second alterations in original) (citation omitted) (internal quotation marks omitted)). Therefore, as noted in Lassiter, a “parent’s interest in the accuracy and justice of'the decision to terminate his or her parental status is ... a commanding one.” Id. at 27, 101 S.Ct. 2153; see Utah Code § 62A-4a-201(l)(b) (“Until the state proves parental unfitness, ... the child and the child’s parents share a vital interest in preventing erroneous termination of their natural relationship.”). Furthermore, the Court indicated that the parent’s “extremely important” interest “may be supplemented by the dangers of criminal liability inherent in some termination proceedings.” Lassiter, 452 U.S. at 31, 101 S.Ct. 2153.
¶26 In this case, the parent’s interests wei-e at their strongest or very nearly so. L.E.S.’s right, as a parent, to the companionship, care, custody, and management of K.A.S. is clearly an important interest. Thus, he has a commanding interest in the accuracy and justice of the parental-rights termination proceeding. Furthermore, there is some concern regarding the risk of self-incrimination in this case, where the district court found that L.E.S. should have taken K.A.S.’s mother to court for refusing to facilitate visits but that he did not do so because “he was afraid because he was on drags,” and where the district court also noted that L.E.S.’s “extensive substance abuse is terms of neglect.” It is unclear whether these findings were based on testimony elicited from L.E.S. or from evidence that was submitted, but L.E.S. did testify and was cross-examined, and it certainly appears that there was a risk of self-incrimination through the disclosure of information regarding his use of controlled substances.[8] Thus, we conclude that L.E.S.’s interests were at them strongest or very nearly so.
II. THE STATE’S INTEREST
¶27 Second, we consider whether the State’s interests in not appointing counsel were at their weakest. As the Court pointed out in Lassiter v. Department of Social Services, the State has divergent interests—it has an interest in appointing counsel as well as in not appointing counsel. The State has a legitimate pecuniary interest in not appointing counsel. 452 U.S. 18, 28, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981). However, the State’s pecuniary interest “is hardly significant enough to overcome private interests as important as those here.” Id. The Court in Lassiter also recognized that “the State may share the indigent parent’s interest in the *287 availability of appointed counsel” because of the State’s “urgent interest in the welfare of the child” and its “interest in an accurate and just decision.” Id. at 27, 101 S.Ct. 2153. In Lassiter, the State was clearly invested in and therefore particularly interested in the child’s welfare, as the parental-rights termination proceeding in that case was initiated by the Department of Social Services after the child had been in foster care for more than two years. Id. at 20-21, 28, 101 S.Ct. 2153.
¶28 The State’s interest in not appointing counsel in the case at hand was relatively weak. The State, of course, had a legitimate pecuniary interest in not appointing counsel, but as in Lassiter, we recognize that that interest is hardly significant enough to overcome an interest as important as a parent’s rights to his or her child. And the State’s interest in terminating L.E.S.’s parental rights was certainly less urgent in this case than it was in Lassiter, because this parental-rights termination proceeding was initiated and advanced by a private party rather than by the State. Regardless, the State still had an interest in the welfare of the child, and the State is necessarily involved in the termination of parental rights since only the State can terminate a parent’s rights to his or her child. Thus, the State still “share[d] with the parent an interest in a correct decision,” which is more “likely to be obtained through the equal contest of opposed interests.” Id. at 28, 31, 101 S.Ct. 2153. In this case, the State’s interest in appointing counsel was stronger than its interest in not appointing counsel. Therefore, we conclude that the State’s interest in not appointing counsel was relatively weak.
III. RISKS OF ERROR
¶29 Third, we consider whether the risks of error were at their peak. Specifically, we consider “the risk that a parent will be erroneously deprived of his or her child because the parent is not represented by counsel.” Lassiter v. Dep’t of Soc. Servs., 452 U.S. 18, 28, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981). Similarly to North Carolina law as set out in Lassiter, Utah law provides a number of procedures to help ensure accurate decisions in parental-rights termination proceedings.[9] By way of example, the petition must include “the grounds on which termination of parental rights is sought.” Utah Code § 78A-6-505(l)(f). Additionally, a hearing must be held on the question of termination of parental rights, and the petitioner must “establish the facts by clear and convincing evidence.” Id. § 78A-6-506(2)-(3).
¶30 Despite such protections, there can still be considerable risk of error in parental-rights termination proceedings, which can be complicated for the parent seeking to defend his or her parental rights without the aid of counsel. The Court in Lassiter recognized the argument that parents are “uniquely well informed” about the subject of the parental-rights termination hearing (the parent’s relationship with the child) but indicated that the ultimate issues in such eases are not always simple. Lassiter, 452 U.S. at 29-30, 101 S.Ct. 2153. The Court pointed out that most parents would have difficulty understanding and confuting expert medical and psychiatric testimony, which is sometimes presented. Id. at 30, 101 S.Ct. 2153. Additionally, it recognized that many parents facing termination proceedings may “be people with little education, who have had uncommon difficulty in dealing with life, and who are, at the hearing, thrust into a distressing and disorienting situation.” Id. Consequently, “courts have generally held that the State must appoint counsel for indigent parents at termination proceedings.” Id.
¶31 In the case at hand, the risks of error were significant. Because this case involves privately initiated termination proceedings, L.E.S. has not enjoyed the additional protections provided in state-initiated termination cases. See, e.g., Utah Code § 62A-4a-203(l)(a) (“[T]he division shall ... make reasonable efforts to prevent or eliminate the *288 need for removal of a child from the child’s home....”); id. § 62A-4a-202(l)(a) (“[T]he division shall provide in-home services for the purpose of family preservation to any family with a child whose health and safety is not immediately endangered, when ... the family is in crisis .... ”); id. § 62A-4a-201(4) (indicating that after a temporary out-of-home placement, “the division may ... (a) when safe and appropriate, return the child to the child’s parent; or (b) as a last resort, pursue another permanency plan”); id. § 78A-6-503(3) (“If the party moving to terminate parental rights is a governmental entity, the court shall find that any actions or allegations made in opposition to the rights and desires of a parent regarding the parent’s child are supported by sufficient evidence to satisfy a parent’s constitutional entitlement to heightened protection against government interference with the parent’s fundamental rights and liberty interests.”); see also infra ¶35 n.10. Also, this case appears particularly disorienting because the court initially appointed counsel for L.E.S. upon a finding of indigence and later reversed the appointment of counsel based on an unopposed motion asserting that Utah law did not provide a right to counsel for termination proceedings in the district court. This left L.E.S. with the need to subsequently make a sophisticated constitutional argument for the right to counsel that he was unable to make without the assistance of counsel.
¶32 Furthermore, L.E.S. was incarcerated throughout the duration of the proceedings, and it is clear from the record that this led to significant communication difficulties and at times even his inability to attend proceedings, either in person or telephonically. The district court recognized early on that L.E.S. “had difficulty contacting family or counsel due to the prison telephone policies to make arrangement^] to retain counsel.” L.E.S.’s sisters attended several of the proceedings and attempted to help L.E.S. with his defense, but their efforts appear to have been hampered by communication issues with L.E.S. in prison. Supra ¶¶7-10. L.E.S. was unable to telephonically attend the status conference during which the final parental-rights termination heai'ing was scheduled “due to changes in probation officers at the prison” that resulted in him not being available by telephone, Supra ¶10. He also was not present at the September 8, 2014 status conference, where his motion to continue was denied. Supra ¶15.
¶33 Additionally, although the district court held a number of status conferences in order to help L.E.S. obtain counsel, the district court mentions only one attorney that L.E.S. actually talked with, and L.E.S. reported to the district court that that attorney “was reluctant to take on the case in fear that because of the ... prison policy she would not be able to provide adequate counsel.”
¶34 While, no expert medical or psychiatric testimony or other similarly complicated evidence was brought before the court, it is possible that had L.E.S. been represented by counsel, such testimony may have been brought. At this stage, it is difficult to conclude that the case, below was simple and uncomplicated, dealing exclusively with issues about which L.E.S., as K.A,S.’s parent, was “uniquely well informed,” when the apparent simplicity of the record may be due to the fact that L.E.S. represented himself pro se and had no opportunity to present more complicated evidence and argument with the aid of counsel. Thus, we conclude that the risks of error in this case were significant, even if-not quite at their peak.
IV. ELDRIDGE FACTORS BALANCED AND WEIGHED AGAINST PRESUMPTION
¶85 Finally, we balance the three Eldridge factors against each other and then weigh them against the presumption against the right to counsel. As already indicated, L.E.S.’s interest is “a commanding one,” and the State shares L.E.S.’s interest in reaching a correct decision. When balancing these interests in favor of appointing counsel against the State’s relatively weak, albeit legitimate, pecuniary interest in not appointing counsel, the equation clearly comes out in favor of appointing counsel. And when we add the significant risks of error to this balance, it becomes abundantly clear that the Eldridge *289 factors favor a right to counsel in this case. Upon weighing these significant interests against the presumption against the appointment of counsel, we hold that they outweigh that presumption and that L.E.S. therefore had a right to appointed counsel under the Due Process Clause of the Fourteenth Amendment. Because the initial appointment of counsel was reversed and L.E.S. had to proceed pro se, his federal due process right to counsel was violated.[10]
¶36 The dissent contends that our analysis “turns th[e] presumption [against the right to appointed counsel in civil cases] on its head” by “virtually guaranteeing] appointment of counsel in most every ease in which a parent’s rights are in jeopardy.” Infra ¶48. We disagree. We note, at the outset, that our task is simply to apply Lassiter to the case before us. That is, our task—our only task— is to consider whether the presumption against L.E.S.’s having a right to counsel is overcome because (1) L.E.S.’s interest in appointed counsel is strong, (2) the State’s interest in denying appointed counsel is weak, and (3) the risks of error are high. Our application of Lassiter in this ease leads us to the conclusion that L.E.S. is entitled to counsel. While it would not surprise us if the presumption against the right to appointed counsel in civil cases were overcome with greater frequency in parental-rights termination proceedings than in other contexts where the stakes are lower and the core issue in the proceedings is less complicated than whether to sever the parent-child relationship, these potential empirical results do not drive our analysis. Our task is to faithfully apply Lassiter to the facts of each ease before us; whatever pattern of outcomes emerges from this exercise is the pattern of outcomes required by the law. Cf. Lassiter v. Dep’t of Soc. Servs., 452 U.S. 18, 30 & n.6, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981) (noting—without apparent concern—that the presumption against the right to counsel in civil eases has “generally” been overcome in the parental-rights termination context).
¶37 The dissent understands the effect of Lassiter’s presumption to be that the right to counsel in civil cases—including parental-rights termination eases—must be found only rarely. See infra ¶63 n.9. This is a misreading *290 of Lassiter. To be sure, Lassiter acknowledges that there is a presumption against the right to counsel in civil cases. But Lassiter nowhere implies that the effect of this presumption is that if courts regularly find a right to appointed counsel in parental-rights termination proceedings they are doing it wrong. To the contrary, Lassiter emphasizes that
the ultimate issues with which a termination hearing deals are not always simple, however commonplace they may be. Expert medical and psychiatric testimony, which few parents are equipped to understand and fewer still to confute, is sometimes presented. The parents are likely to be people with little education, who have had uncommon difficulty in dealing with life, and who are, at the hearing, thrust into a distressing and disorienting situation. That these factors may combine to overwhelm an uneounseled parent is evident. ...
Lassiter, 452 U.S. at 30, 101 S.Ct. 2153. For this reason, Lassiter notes, “courts have generally held that the State must appoint counsel for indigent parents at termination proceedings.” Id. Nor does Lassiter lament, or seek to change, this state of affairs. To be sure, at one point the Lassiter court conceded that it could not “say that the Constitution requires the appointment of counsel in every parental termination proceeding.” Id. at 31, 101 S.Ct. 2153. And it is certainly true that the Lassiter court concluded, under the specific facts before it, that counsel did not need to be appointed. But Lassiter’s agnosticism about the frequency with which the Constitution would end up requiring the appointment of counsel in parental-rights ter-imitation proceedings is a far cry from a hard-nosed insistence that lower courts should work to make sure that the right to counsel in parental-rights termination cases is only grudgingly found.
¶38 We also disagree with the dissent that our application of Lassiter “demands appointment in the run of the mill case.” Infra ¶73 n.17. Instead, our application of Lassiter requires the appointment of counsel whenever the parent’s interest in appointed counsel is strong, the state’s interest is weak, and the risks of error are high. Our opinion is consistent with the proposition that in a case with circumstances like Lassiter—where, for example, the parent has not taken an interest in the proceedings and “the weight of the evidence” of the parent’s lack of interest in the child is “great”—or in a case where the parent faced fewer procedural or institutional barriers to availing himself of the court, the presumption against the right to counsel will not be overcome. Lassiter, 452 U.S. at 32, 101 S.Ct. 2153; cf. supra ¶35 n.10 (noting evidence of L.E.S.’s interest in parenting K.A.S.). But, again, like the Supreme Court in Lassiter, our analysis is not driven by any empirical speculation about the frequency with which the presumption against the right to counsel will be overcome in parental-rights termination proceedings. We focus only on application of the legal test.[11] And, for the reasons we have explained, our application of that test leads us to the conclusion that the presumption against the right to counsel is overcome in this case.
CONCLUSION
¶39 As discussed, we conclude that in the narrow circumstances of this ease, the excep *291 tional circumstances exception to the preservation requirement applies to allow us to reach L.E.S.’s constitutional arguments for the right to counsel. We also hold, based on the Lassiter test, that L.E.S. had a federal due process right to counsel in this case and that that right was improperly denied.[12] Therefore, we reverse the decision of the court below.
¶40 However, although L.E.S. had a federal due process right to counsel earlier, it is unclear from the facts of the case whether he has such a right now. The right to counsel is available only to indigent individuals. During the proceedings below, L.E.S. requested a continuance until at least April 29, 2015, and in his briefing to the Utah Supreme Court, he indicated that he had hoped “to push the proceeding back to April when he would be out of prison and could pay for private counsel.” Based on that information, L.E.S. is presumably no longer incarcerated, having presumably been released more than a year ago. Whether he is worldng and his current financial status are unknown to us. Thus, we do not know whether he is indigent. We therefore instruct the district court to first make a determination of whether L.E.S. is indigent. If the district court finds L.E.S. indigent, it should then proceed to apply the Lassiter test based on the facts and circumstances as they stand at that point, in order to determine whether L.E.S. should be appointed counsel based on federal due process for the parental-rights termination proceeding going forward.

. While the juvenile court ordinarily assumes jurisdiction over termination of parental rights cases, Utah Code section 78B—6—112(1) authorizes the district court to hear such a case “if the party who filed the petition is seeking to terminate parental rights in the child for the purpose of facilitating the adoption of the child.”

. To conclude otherwise would be to require L.E.S. to have filed a motion that is not technically recognized by the Utah Rules of Civil Procedure. We decline to require parties to file motions that our cases say do not exist See Tschaggeny v. Milbank Ins. Co., 2007 UT 37, ¶ 15, 163 P.3d 615 ("[T]rial courts are under no obligation to consider motions for reconsideration. ...”).

. Our holding today should not be construed to mean that the exceptional circumstances exception applies any time a lawyer fails to make an argument. Rather, our holding is intricately tied to the deprivation of counsel under tire unique facts of this proceeding. Here, a lawyer was appointed, but abdicated all responsibility by failing to make any argument regarding L.E.S.'s right to representation, constructively denying L.E.S. counsel and leaving him without the technical ability to present to the district court his own, separate argument for counsel. Moreover, L.E.S. ,is without a meaningful malpractice action as that does not provide a vehicle for regaining his parental rights in K.A.S.

. Because we find that L.E.S. had a federal due process right to counsel, and as a matter of constitutional avoidance, we do not reach his other constitutional arguments for the right to counsel, namely the arguments under state due process and federal equal protection. Regarding the federal equal protection argument, we note that L.E.S. challenged the constitutionality of two sections of the Juvenile Court Act. New versions of those provisions were issued while the case was still ongoing in the district court, and we requested additional briefing from the parties and briefing from the Attorney General's Office regarding the constitutionality of those statutes and which version applied to the proceedings. Since then, new versions have again been issued in 2016. If we were to consider whether equal protection provides a right to counsel, we would have to again request briefing about which version of the statute would apply, which would further delay resolution. Thus, the concern about additional delay in a case where time is of the essence is an additional reason for us to not reach L.E.S.'s other constitutional arguments.
Our holding today also means we do not need to address the constitutionality of the relevant section of the Juvenile Court Act—Utah Code section 78A—6—1111(2)—under federal due process. This section, at least as of 2014, prohibited court-appointed counsel for proceedings initiated by a private party in juvenile courts, but it neither provided for nor prohibited the appointment of counsel in district courts. As we explain in this opinion, the district court had an independent obligation to conduct a Lassiter analysis, and nothing in section 1111(2) is to the contrary, as by its own terms, the Juvenile Court Act applies only to juvenile court proceedings. See Utah Code § 78A-6-105(10) "'Court' means the juvenile *285 court.”. Therefore, as we have already decided that section 1111(2) is not facially unconstitutional in In re E.K.S., 2016 UT 56, 387 P.3d 1032, and because we do not resolve this case under the Juvenile Court Act, we need not and do not reach the issue of whether section 1111(2) is constitutional as applied under the Due Process Clause of the Fourteenth Amendment of the United States Constitution.

. Mathews v. Eldridge, 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) "propounds three elements to be evaluated in deciding what due process requires, viz., the private interests at stake, the government’s interest, and the risk that the procedures used will lead to erroneous decisions.” Lassiter v. Dep’t of Soc. Servs., 452 U.S. 18, 27, 101 S,Ct. 2153, 68 L.Ed.2d 640 (1981).

. The dissent suggests that “the Lassiter standard is highly dependent on the third ... factor” (i.e., the risk of error), almost to the exclusion of the first two factors. Infra ¶70. We cannot agree with this proposition. It is true that the third, factor is important and perhaps has drawn the most attention, but that is not to say that the other two factors do not play a role. We read,Lassiter to require all three. Lassiter, 452 U.S. at 31, 101 S.Ct. 2153 ("The dispositive question ... is whether the three Eldridge factors, when weighed against the presumption that there is no right to appointed counsel ..., suffice to rebut that presumption....”).

. Unless otherwise indicated, citations are to the current edition of the Utah Code. We have omitted the date from citations to the current edition.

. Aside from the risk of self-incrimination, there might also be some danger of criminal liability based on allegations in the petition to terminate L.E.S.’s rights. In Lassiter, it appears that "the petition to terminate Ms. Lassiter's parental rights contained no allegations of neglect or abuse upon which criminal charges could be based.” Lassiter, 452 U.S. at 32, 101 S.Ct. 2153. In contrast, the petition in this case alleged neglect and emotional abuse, including a statement that L.E.S. "has not paid child support for years.” Admittedly, however, it is not clear whether the allegations here are sufficient to potentially lead to criminal charges (for example, it is unclear whether "child support” refers to court-ordered child support).

. The procedures outlined in this paragraph are some of those applicable to the particular circumstances of this case as opposed to an exhaustive listing of procedures for ensuring accurate decisions in parental-rights termination proceedings generally under Utah law. And although they appear in the Juvenile Court Act, we assume here that these procedures apply to parental-rights termination proceedings that take place in district court.

. In Lassiter, the Court’s analysis includes the mother’s lack of interest shown in the child and disinclination to participate in the judicial process. The Court observed that "the weight of the evidence, that [Ms. Lassiter] had few sparks of ... interest [in her son] was sufficiently great that the presence of counsel for Ms. Lassiter could hot have made a determinative difference.” Lassiter v. Dep't of Soc. Servs., 452 U.S. 18, 32-33, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981). In the case at hand, however, L.E.S. indicates that he tried for years "to contact or have contact with [K.A.S.] but her mother refused or avoided the subject.” He provided copies of a number of Facebook messages to back up that assertion. In those messages, he expressed that he missed K.A.S. and wanted to see her again, including a request "to arrange visitations” and to stop "stalling.” Granted, L.E.S. did not take K.A.S.’s mother to court for refusing to facilitate visits, because "he was afraid because he was on drugs.” Supra ¶26. But unlike the mother in Lassiter, L.E.S. has clearly shown interest in his child.
L.E.S, has also shown that interest through his efforts to participate in these proceedings, again unlike the mother in Lassiter. In Lassiter, the mother "had expressly declined to appear at the 1975 child custody hearing” and "had not even bothered to speak to her retained lawyer after being notified of the termination hearing.” Lassiter, 452 U.S. at 33, 101 S.Ct. 2153. Her “failure to malee an effort to contest the termination proceeding was [found to be] without cause.” Id. Here, however, L.E.S. gave notice pro se that he contested the adoption, and he attended a number of court conferences, both in person and telephonically, and attempted to retain counsel. Supra ¶¶2, 5-7. He also filed, again pro se, a motion for continuance, and upon the denial of that motion and termination of his rights, he filed a pro se notice of appeal and has continued to pursue the matter in court. Supra ¶¶13, 16-17.
Thus, unlike in Lassiter, we cannot conclude that "the presence of counsel ... could not have made a determinative difference” based on the parent's indifference to the child. See 452 U.S. at 32-33, 101 S.Ct. 2153. Furthermore, L.E.S. has actively participated in the case, unlike the mother in Lassiter, whose "plain demonstration that she is not interested in attending a hearing” was among the circumstances considered by the Court in holding that "the trial court did not err in failing to appoint counsel.” Id. at 33, 101 S.Ct. 2153.
Another difference between the two cases, which is not, however, included in the analysis section in Lassiter, is the length of incarceration of the parent. In Lassiter, the mother had been sentenced to "25 to 40 years of imprisonment.” Id. at 20, 101 S.Ct. 2153. L.E.S., in contrast, expected to be released from prison within nine months of his August 4, 2014 motion for continuance. See supra ¶ 13.

. In any event, we note that even if application of the Lassiter test will result in the right to appointed counsel in many cases in which a parent's rights are in jeopardy, this result stems, in large part, from the existence of a statutory right to counsel under Utah Code section 78A-6-111 l(l)(c). Under that section, indigent parents have the right to counsel in parental-rights termination proceedings initiated by the State or a political subdivision of the State in juvenile court. Id. In such state-initiated termination cases, tire risk of error is likely to be lower because of the State's goal to preserve families if possible and because of additional protections such as the provision of in-home services and the requirement of "sufficient evidence to satisfy a parent's constitutional entitlement to heightened protection against government interference with the parent's fundamental rights and liberty interests.” Utah Code §§ 62A-4a-201(l)(a), 78A-6-503(3); see also id. §§ 62A-4a-203(l)(a), 62A-4a-202(1 )(a). Because of the lower risk of error, the presumption against the right to counsel would be less likely to be overcome. However, because of the statutoiy right to counsel under Utah Code section 78A-6-llll(l)(c), the Lassiter test is not applied in such cases. Consequently, while it might appear that the presumption in Lassiter is "turn[ed] ... on its head,” in reality the Lassiter test is simply never applied to many of the cases in Utah in which the presumption might prevail.

. Citing In re J.D.M., 810 P.2d 494 (Utah Ct. App. 1991), L.E.S. argues that he is entitled to his attorney fees on appeal. However, L.E.S. misreads In re J.D.M. In Utah, a party is generally entitled to attorney fees only when such fees are authorized by contract or by statute. Bilanzich v. Lonetti, 2007 UT 26, ¶ 11, 160 P.3d 1041 ("Generally, attorney fees are awarded only when authorized by contract or by statute."). Neither contractual nor statutory authorization is present in the case at hand. And to the extent that L.E.S. is arguing for an exception to the general rule that attorney fees are awardable only when authorized by contract or by statute, that argument is inadequately briefed and we reject it.
We also recognize that there may be an equal protection argument for requiring attorney fees on appeal to be paid in termination proceedings originating in district court as they are for those originating in juvenile court. Utah Code § 78A-6-llll(l)(g). There may also be an argument that Lassiter requires appointment of counsel on appeal for indigent parties. However, these arguments are not before us today. Accordingly, we deny L.E.S.'s request for attorney fees on appeal.